UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| B.M. and T.M., *on behalf of their minor child*,<br><br>Plaintiffs,<br><br>-v-<br><br>PLEASANTVILLE UNION FREE SCHOOL DISTRICT,<br><br>Defendant. | 20-CV-2192 (KMK)<br><br>OPINION & ORDER |

Appearances:

Neal H. Rosenberg, Esq.
Law Office of Neal Rosenberg
New York, NY
*Counsel for Plaintiffs*

Mark C. Rushfield, Esq.
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, NY 12603
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

Plaintiffs B.M. and T.M. ("Plaintiffs" or the "Parents") bring this Action on behalf of their minor child, F.M. (the "Student"), against the Pleasantville Union Free School District ("Defendant" or the "District") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*  (*See* Compl. (Dkt. No. 1).)  The dispute arises out of the decisions of the Impartial Hearing Officer ("IHO") and the State Review Officer ("SRO") who adjudicated Plaintiffs' administrative claims for relief arising out of Defendant's alleged failure to provide F.M. a free and appropriate public education during the 2018–19 school year.  Before the Court is Plaintiffs' Motion for Summary Judgment.  (*See* Pls.' Not. of Mot. for Summ. J. (Dkt. No. 8).) For the following reasons, the Motion is denied.

I.  Background

A.  Factual Background

1.  The Student's Educational and Medical History

According to Plaintiffs, the Student has a history of "academic, medical, social/emotional[,] and behavioral concerns [that] impair her ability to function within a mainstream school and classroom."  (Compl. ¶ 19.)  She has been diagnosed with Autism Spectrum Disorder ("ASD"), Attention Deficit Hyperactivity Disorder ("ADHD") / Attention Deficit Disorder ("ADD") combined type (together, "ADHD/ADD"), Other Specified Anxiety Disorder with features of generalized anxiety, specific phobia, and compulsive behavior.  (*Id.*; Def.'s Counter 56.1 Statement in Opp'n to Pls.' 56.1 ("Def.'s Counter 56.1") § II.A.2(1) (Dkt. No. 12).)  She "has social pragmatic deficits and executive functioning weaknesses" and experiences "persistent difficulty regulating her emotions."  (Compl. ¶ 19; Def.'s Counter 56.1 § II.A.2(2), (6).)  She has a "history of concerns related to impulsive behavior, inattention[,] and social skills, as well as fine motor skills."  (Decision of SRO ("SRO Op.") 2 (Dkt. No. 1).)[1]

In August 2017, Plaintiffs obtained a private neuropsychological evaluation for their daughter performed by Dr. Kelly Janke ("Dr. Janke").  (Compl. ¶ 21; SRO Op. 4.)[2]  Plaintiffs sought this private evaluation based on their "ongoing concerns about the appropriateness of the District middle school."  (Compl. ¶ 21.)  In addition to confirming the Student's ASD and ADHD diagnoses, Dr. Janke also diagnosed the Student with "other specified anxiety disorder,"

---

[1] Plaintiffs attached the SRO Opinion directly to their Complaint.  It can be located at ECF pages 30–58 of Docket No. 1.

[2] Although the SRO Opinion does not refer to Dr. Janke by name, referring instead to a "private neuropsychologist," (*see, e.g.*, SRO Op. 4), it is clear from the record that this "private neuropsychologist" refers to the physician identified by Plaintiffs as Dr. Janke.

(SRO Op. 4), and concluded that the Student had a "long standing" difficulty with "pragmatic language and understanding verbal cues," (Impartial Hr'g Officer's Findings of Fact & Decision ("IHO Op.") 5 (Dkt. No. 1)).[3] Dr. Janke opined that the Student needed a "specialized school setting to meet her complex needs," including a small class size with 1:1 support, "daily general executive skills/organization support, daily support to develop coping and social skills, and progress monitoring." (SRO Op. 4; *see also* IHO Op. 5–6.) Dr. Janke also recommended 12-month services ("Extended School Year Services" or "ESY Services") to ensure the Student retained progress in certain social and academic skills. (SRO Op. 4.) She also recommended that the Student receive counseling, speech-language therapy, occupational therapy, and resource room support. (*Id.*)

The District's Committee on Special Education ("CSE") convened in October 2017 to review the results of the August 2017 evaluation performed by Dr. Janke. (*Id.*) At this meeting, one of the Student's parents requested that the CSE consider an approved private school placement for the Student based on the belief that the Student's current program did not adequately address her anxiety, ADHD, or ASD diagnoses. (*Id.*) The parent informed the CSE that the Student's behavior over the summer had regressed, and that she was experiencing more tantrums and had been hitting her parents. (IHO Op. 6.) Although the CSE did not recommend a private school placement, it did recommend that the Student's "triennial testing be moved forward" to assess more readily the Student's current level of academic performance. (SRO Op. 4.) The CSE also recommended that the Student receive "assistive technology," occupational therapy, speech-language evaluations, a functional behavioral assessment, and a behavior

---

[3] Plaintiffs attached the IHO Opinion directly to their Complaint. It can be located at ECF pages 59–88 of Docket No. 1.

intervention plan.  (*Id.*)  With respect to the Student's academic content, the CSE recommended a "[therapeutic support program ('TSP')] study skills special class," a 15:1+1 special class in modified math and modified English, and "consultant teacher services" in social studies, science, physical education, and one elective.  (*Id.*)[4]  The CSE also recommended a weekly small group counseling session, a weekly individual counseling session, and two sessions per month of parent training in the "school/community."  (*Id.*)  The CSE deferred Dr. Janke's recommendation for ESY Services "pending review."  (*Id.* (record citation omitted); *see also* IHO Op. 6–7.)

During the 2017–18 school year, the Student had trouble arriving to school on time, showed impulsive behavior, and "asked questions in a perseverative manner."  (SRO Op. 5.) When she did attend school, she often spent the day in the "TSP room," rather than attending her special education and general education classes.  (IHO Op. 11.)  The Student would refuse to eat lunch in the school cafeteria with other students, secluded herself from school activities, and stated that she did not want to be in school.  (*Id.*)

The District conducted a functional behavioral assessment in January 2018 to address these behaviors, and subsequently developed a behavior intervention plan.  (SRO Op. 5.)  From January to April 2018, the District also performed a range of evaluations on the Student.  (*Id.*)  In March 2018, for example, a psychiatrist for the Board of Cooperative Educational Services ("BOCES")—Dr. Parinda Parikh ("Dr. Parikh")—performed an initial evaluation of the Student.

---

[4] In the unique vernacular of elementary and secondary education, a ratio of "15:1+1" means 15 students, one teacher, and one paraprofessional per class.  *See E.H. v. N.Y.C. Dep't of Educ.*, 164 F. Supp. 3d 539, 544 n.4 (S.D.N.Y. Feb. 16, 2016) ("The ratio's format expressed in three numbers indicates students:teachers[+]paraprofessionals.").

(*Id.*; Compl. ¶ 24.)[5]  The evaluation report indicated that Plaintiffs were concerned about the

Student's "express[ing] that she visualizes wanting to kill herself."  (SRO Op. 5 (record citation

omitted).)  The Student reportedly indicated that she hated school and had no friends, was

experiencing depression, and that her aide was "getting mad at her."  (*Id.* (record citation

omitted).)  The report also noted that the Student was avoiding school and experiencing various

social and academic challenges.  (*Id.*)  Although she recommended "medication management"

and "social skills and individual therapy," the BOCES psychiatrist stated that she would "leave it

up to the CSE" to determine an appropriate placement for the Student.  (*Id.*; *see also* Compl.

¶ 24; IHO Op. 7.)  In April 2018, the District conducted another psychological evaluation of the

Student.  (IHO Op. 9.)  The evaluator, Dr. Megan Cunningham ("Dr. Cunningham"), noted that,

according to the Student's parents, the Student had no friends at school and "was not developing

socially or emotionally."  (*Id.* (record citation omitted).)  One of the parents also reported that the

Student was moody, irritable, and sad, and had told the parent that she "wanted to die or wished

to be dead."  (*Id.* at 10 (record citation omitted).)

Finally, in May 2018, Dr. Janke performed additional testing on the Student, with a focus

on her "social/emotional and behavioral needs."  (Compl. ¶ 28.)  Dr. Janke provided an

addendum to her previous report in May 2018, (SRO Op. 5), concluding that the Student

presented as "that of a rigid and distressed young woman who [was] struggling with functional

academics and life skills despite average intellectual functioning," (Compl. ¶ 28 (record citation

omitted)).  Dr. Janke recommended that the Student be placed in a therapeutic day program that

---

[5] Although the SRO Opinion refers only to a "psychiatrist working through the
[BOCES]," (SRO Op. 5), the Complaint makes clear that this physician was Dr. Parikh, (*see*
Compl. ¶ 24; *see also* IHO Op. 7).

serviced other students with ASD and similar behavioral and emotional needs.  (*Id.*; *see also* IHO Op. 11–12.)

### 2.  The Student's IEP for the 2018–19 School Year

On June 14, 2018, the CSE convened to develop an individualized education program ("IEP") for the Student for the 2018–19 school year.  (SRO Op. 5.)[6]  Dr. Janke presented her findings and recommendations during this meeting, including her belief that the Student was "at risk for increased mood dysregulation" in high school "due to social pragmatic deficits, heightened anxiety[,] and daily living skills needs."  (Def.'s Counter 56.1 § II.B.2 (record citation omitted).)  She expressed concern about the makeup of the classroom for the Student's upcoming year and said that the Student should be placed with similar peers.  (SRO Op. 16.)  With respect to the Student's emotional dysregulation, Dr. Janke observed that although "the [S]tudent may be holding it together at school[,] . . . she really amps up at home and similar behaviors were observed in an observation during the testing sessions at her office."  (Def.'s Counter 56.1 § II.B.2 (record citation omitted).)  During the June 2018 meeting, the CSE also discussed the report prepared by Dr. Parikh based on her March 2018 evaluation of the Student.  (SRO Op. 18.)  Dr. Cunningham reviewed Dr. Parikh's report and noted that the Student had "shown increased school resistance this school year as opposed to in the past."  (Def.'s Counter 56.1 § II.B.2–3 (record citation omitted).)  Dr. Cunningham also noted Plaintiffs' disclosure that the Student had "expressed feelings of wanting to hurt herself," which was included in Dr. Parikh's report.  (*Id.* § II.B.3 (record citation omitted).)  At the meeting, the Student's mother "expressed frustration related to [her daughter's] current therapeutic supports," and "expressed

---

[6] As discussed in greater detail *infra*, under the IDEA, "[s]chool districts, through a CSE, are responsible for formulating a written IEP for every qualifying child."  *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016) (footnote omitted).

feeling as though counseling and group therapy [were] the only services that her daughter ha[d] been provided with." (*Id.* § II.B.5 (record citation omitted).) She expressed the view that four years had gone by with "no improvement" in the District's middle school. (IHO Op. 13.) Plaintiffs also expressed their belief that the Student should be placed in a therapeutic day program. (Def.'s Counter 56.1 § II.B.6; Compl. ¶ 30; IHO Op. 13.)

Based on its review, the CSE recommended that the Student attend the District high school in an "individual support program" ("ISP") that would include special classes in study skills and health/life instruction; special classes in modified English, modified science, and modified social studies; a daily, 40-minute period of "5:1 resource room services"; bimonthly "TSP consultant teacher services in physical education"; and weekly "ISP consultant teacher services in math." (SRO Op. 5.) The CSE also recommended that the Student receive a weekly small group counseling session, a weekly individual counseling session, a weekly small group speech-language therapy session, and "twice monthly family training sessions in the school/community." (*Id.*; *see also* Compl. ¶ 30.) Finally, the CSE also recommended "numerous program modifications and accommodations" that included "full time 1:1 aide services, assistive technology, behavioral intervention consultations with various staff, and [ESY Services] for summer 2018." (SRO Op. 5.)

When the Student did not attend the 2018 summer program that was recommended as part of her IEP, the Student's special education teacher contacted one of the Plaintiffs, who advised that the Student's private psychiatrist believed such a program would be "detrimental" to the Student. (*Id.* at 20.) Additionally, after reviewing the Student's IEP, Plaintiffs wrote a letter to the District expressing their disagreement with the CSE's recommendations and reiterating their belief that the Student "should be placed in an out-of-[D]istrict, appropriate program."

7

(Compl. ¶ 31; Def.'s Counter 56.1 § II.B.7.)  In the letter, Plaintiffs indicated that the Student had said "she would just die if she had to go" to the District's high school.  (SRO Op. 6 (brackets and record citation omitted).)

In response to this letter, the CSE re-convened on July 31, 2018 to consider Plaintiffs' concerns regarding the IEP, particularly the recommendation that the Student attend the District's high school.  (Compl. ¶ 31; Def.'s Counter 56.1 § II.B.8.)  At the meeting, Plaintiffs presented the CSE with a letter, dated July 18, 2018, from the Student's private psychiatrist, Dr. Lee Cohen ("Dr. Cohen").  (Compl. ¶ 32; Def.'s Counter 56.1 § II.B.8; SRO Op. 6.)  The letter was read aloud at the meeting.  (*See* Def.'s Counter 56.1 § II.B.8.)  In the letter, Dr. Cohen indicated that he had been treating the Student since 2012 and observed that the Student's "complex medical and neuropsychiatric" needs could not "be well managed in a public school setting, or even in a therapeutic support setting due to the excess stimuli of such a large setting." (SRO Op. 6 (record citation omitted); *see also* Def.'s Counter 56.1 § II.B.8 (record citation omitted).)  Dr. Cohen opined that such a setting "could be detrimental to the [Student's] academic and social progress."  (Def.'s Counter 56.1 § II.B.8 (record citation omitted).) Accordingly, Dr. Cohen advised placing the Student in a school with "a much smaller student to teacher ratio and [which] has a broad spectrum of therapeutic services."  (SRO Op. 6 (record citation omitted).)  During the meeting, the parents also reported that the Student had stated "that if she ha[d] to attend the [D]istrict's high school[,] she would kill herself."  (*Id.* at 20 (brackets and record citation omitted).)  The parents reported that the Student had "been saying this since mid-year," and queried whether the District was "willing to take that risk that the [S]tudent may hurt herself" if she were placed at the District high school.  (*Id.* (brackets and record citation omitted).)  In light of this information, the CSE agreed to search for an out-of-District day

placement.  (SRO Op. 6; *see also* Def.'s Counter 56.1 § II.B.8.)  The CSE indicated that it would reconvene and recommend a placement after conducting a search.  (SRO Op. 6.)

On August 8, 2018—eight days after the CSE agreed to search for an out-of-District placement for the Student—Plaintiffs executed an enrollment contract for the 2018–19 school year with the Pinnacle School ("Pinnacle"), (*id.*), which is a private school in Connecticut, (IHO Op. 2).  The following day, Plaintiffs received a draft IEP from the District indicating that the Student would be placed in an "Approved Private School" day program.  (SRO Op. 6 (record citation omitted).)  A week later, on August 16, 2018, Plaintiffs expressed concern that they would not have enough time to visit and consider any proposed placements before the start of the academic year, and therefore indicated that they intended to place the Student at Pinnacle and would seek reimbursement for tuition and associated costs.  (*Id.*)  They also requested that the District provide transportation to Pinnacle, which the Student began attending in late August 2018.  (*Id.*)  The Student attended Pinnacle for the duration of the 2018–19 academic year. (Compl. ¶ 35.)

Having been contacted by Southern Westchester BOCES ("SW BOCES"), Plaintiffs attended an intake interview and tour of SW BOCES' "TSP-I" program at Rye Lake ("Rye Lake") on August 22, 2018.  (SRO Op. 6.)  Plaintiffs also attended tours at a different BOCES program and an alternative high school program in a separate district.  (*Id.*)  After it received acceptance responses from two out-of-District programs, the CSE re-convened on September 5, 2018 to consider and recommend a placement.  (*Id.*)  At this meeting, representatives from Rye Lake and the Kenneth Clark Academy—the two programs that had accepted the Student— participated by telephone.  (IHO Op. 15.)  After considering both programs, the CSE recommended that the Student be placed at Rye Lake.  (*Id.*; SRO Op. 6.)

3.  Plaintiffs' Due Process Complaint and Impartial Hearing Officer Decision

Plaintiffs filed a Due Process Complaint dated December 31, 2018, alleging that

Defendant failed to offer the Student a free and appropriate public education ("FAPE") for the

2018–19 school year.  (IHO Op. 2; Def.'s Counter 56.1 § I.A.1, 4.)  The Due Process Complaint

sought a finding to this effect, as well as an order for tuition reimbursement and associated costs

for the Student's attendance at Pinnacle.  (IHO Op. 2; Def.'s Counter 56.1 § I.A.4.)  Plaintiffs

argued that the CSE's initial IEP (the "June 2018 IEP")—which recommended that the Student

attend the District high school—was inappropriate because such a placement would not meet the

Student's social, emotional, and academic needs.  (IHO Op. 2; SRO Op. 7.)  They claimed that

the Student's private neuropsychological evaluation showed that she needed "a small, nurturing

special education school specifically designed to address the learning, emotional[,] and

behavioral needs of students with ASD."  (SRO Op. 7 (record citation and brackets omitted).)

The "large general education public school" recommended by the CSE, Plaintiffs argued, would

not provide this necessary support.  (*Id.* (record citation omitted).)  Plaintiffs also challenged the

IEP as revised in September 2018 (the "September 2018 IEP").  In particular, Plaintiffs argued

that placing the Student at Rye Lake, as the CSE recommended, would not have ensured that the

Student was grouped with similarly functioning peers.  (*Id.*; IHO Op. 2.)  They also argued that

the September 2018 IEP was "substantively deficient" because the goals were vague, the

program failed to outline strategies for achieving those goals, and the goals did not adequately

address the Student's needs as they related to her ASD diagnosis, phobias, and anxiety.  (SRO

Op. 7.)  They alleged that this IEP was "rooted more in bureaucratic and budgetary concerns than

in developing an appropriate program designed to address the unique, individualized needs of the

Student."  (*Id.* (alteration omitted).)  Finally, Plaintiffs argued that their unilateral decision to

enroll the Student at Pinnacle was appropriate, and that the equities favored their claim for reimbursement.  (IHO Op. 2; SRO Op. 7.)

In response, the District argued that the June 2018 IEP was "superseded" by the September 2018 IEP, and that Rye Lake was a suitable placement for students with learning disabilities and other limitations such as those experienced by the Student.  (SRO Op. 7 (record citation omitted).)  The District also challenged Plaintiffs' contention that the Student would not have been grouped with sufficiently similar peers at Rye Lake.  (*Id.*)  The District maintained that the Student's IEP for the 2018–19 school year "provide[d] sufficient and appropriate goals to address [her] needs," (*id.* at 7–8 (record citation omitted)), and thus argued that the District had provided the Student with a FAPE, (IHO Op. 3).  The District also argued that it was not obligated to provide tuition reimbursement following Plaintiffs' unilateral decision to enroll the Student at Pinnacle.  (*Id.*)

The Impartial Hearing Officer ("IHO") held a pre-hearing conference on February 15, 2019.  (*Id.* at 4.)  The hearing (the "Impartial Hearing") convened on April 8, 2019 and concluded on June 10, 2019 after five days of proceedings.  (SRO Op. 8.)  In a decision signed August 11, 2019, the IHO concluded that the District had failed to offer the Student a FAPE for the 2018–19 school year and ordered the District to reimburse Plaintiffs for the entire cost of annual tuition at Pinnacle, along with related transportation costs.  (IHO Op. 20, 25.)  The IHO's decision boils down to four key conclusions.

First, although the District argued that the June 2018 IEP was appropriate at the time it was issued, and maintained that "the [S]tudent's needs and program recommendation only changed after [the CSE] received [the] letter from Dr. Cohen in July 2018," the IHO found this argument unavailing.  (*Id.* at 20–21.)  The "record evidence," he concluded, "clearly

demonstrates that the District was aware of the [S]tudent's social/emotional challenges throughout the 2017–2018 school year"—including her school avoidance issues, her aggressive behavior outside of school, and the fact that she had "express[ed] self-harm"—but had "failed to plan accordingly," that is, had failed to recommend an out-of-District, therapeutic day program at which the Student could be placed.  (*Id.*)  "It is undisputed," the IHO concluded, "that the [June 2018 IEP] was inappropriate and failed to offer the student [a] FAPE."  (*Id.* at 20.)

Second, the IHO found that even after the CSE decided to recommend an out-of-District placement, the September 2018 IEP still failed to offer a FAPE.  (*Id.*)  In addition to finding that the September 5, 2018 placement at Rye Lake "was too late for the parents to reasonably plan for the [S]tudent's program for the 2018–2019 school year," (*id.*), the IHO concluded that the District and Rye Lake failed to explain sufficiently "how the [S]tudent's social-emotional challenges regarding self-harm and her ASD would be addressed at Rye Lake," (*id.* at 22).  The IHO also concluded that placement at Rye Lake was inappropriate because the Student would not have been placed alongside similarly functioning peers in accordance with New York State regulations.  (*Id.* at 22.)

Third, the IHO concluded that Pinnacle was an appropriate placement for the Student. (*Id.* at 23.)  He cited Pinnacle's "integrative education model" that is "specifically formulated" for students with "high functioning Autism," as well as the fact that Pinnacle's other students share an "educational profile" similar to that of the Student: namely, they "are of average to above average in intelligence" and have a diagnosis of Autism.  (*Id.*)  Pinnacle's curriculum, the IHO also noted, "is modified and individualized to meet the [S]tudent's needs."  (*Id.*)

Finally, in weighing the equities, the IHO noted that the Student's parents had cooperated with the CSE process and had given the District the required 10-day notice before "actually

enrolling" the Student at Pinnacle.  (*Id.* at 25.)  Although the District argued that the parents had

not kept an "open mind" with respect to the CSE's proposed placement, the IHO concluded that

"the evidence show[ed] that the parents were correct with respect to the [S]tudent's need for a

therapeutic day program, which the District . . . ultimately conceded was appropriate."  (*Id.*)

Based on these considerations, the IHO found that the equities warranted an award of tuition

reimbursement and associated transportation costs for the parents.  (*Id.*)

### 4.  The SRO Decision

On appeal, the SRO first addressed the IHO's conclusion that the June 2018 IEP was

inappropriate because it failed to recommend an out-of-District placement.  (SRO Op. 12.)  The

SRO found that that the IHO's reasoning in this regard suffered from two fundamental flaws.

First, the SRO concluded that the IHO did not adequately explain why the CSE was

required to place the Student in an out-of-District program based on the information available at

the time of the June 2018 meeting.  (*See id.* at 17–18.)  As the SRO noted, the IDEA requires not

only that school districts provide disabled children with an education program reasonably

calculated to enable their progress, but also that they provide a student's recommended program

in the least restrictive environment.  (*See id.* at 16–17 (citing, *inter alia*, *A.D. v. N.Y.C. Dep't of*

*Educ.*, No. 12-CV-2673, 2013 WL 1155570, at *8 (S.D.N.Y. Mar. 19, 2013) (noting that "once

the CSE determined that a 6:1:1 classroom would be appropriate for the [s]tudent, it had

identified the least restrictive environment that could meet the [s]tudent's needs and did not need

to inquire into more restrictive options such as nonpublic programs")).)  Discussing the June

2018 IEP in detail, the SRO noted that the CSE had added ESY Services to the Student's

recommended educational program.  (*Id.* at 17.)  Thus, during the summer, the Student would

attend a full-day "special class placement at the [D]istrict's high school with full time 1:1 aide

services, and [would] receive" a weekly individual counseling session, a weekly small-group speech-language therapy session, and a biweekly family training session. (*Id.*) The addition of ESY Services was intended "both to prevent academic/behavioral regression and to support the [S]tudent's readiness for [high school]." (*Id.* at 17–18 (brackets omitted) (second alteration in original).) In light of the services offered in the June 2018 IEP, the SRO found that

> [t]he IHO did not provide an explanation of why, at the time of the June meeting, he believed removal of the [S]tudent from the [D]istrict to an out-of-[D]istrict placement was required as opposed to the route that the CSE attempted—keeping the [S]tudent in [D]istrict and adding the ESY [S]ervices in response to the [S]tudent's increased school avoidance and anxiety.

(*Id.* at 18.) Thus, "contrary to the IHO's finding," the SRO concluded, "the CSE provided the [S]tudent with a special class setting and supports such as a 1:1 aide, counseling[,] and family training specifically to prevent regression of skills surrounding her ability to attend school and address her 'social/emotional challenges' in a variety of settings." (*Id.*) The IHO failed to "grapple with how the CSE modified the programming in the June 2018 IEP to add ESY [S]ervices," and although the IHO acknowledged that a behavior intervention plan was developed based on a functional behavioral assessment, he did not "articulate any specific criticism of the evaluator's assessment or the strategies recommended." (*Id.* at 19.)

Second, unlike the IHO, the SRO found that the evaluative information available to the CSE changed in key respects *after* the June 2018 meeting, and it was not until July 2018 that the Student's expressions of self-harm were directly tied to the possibility of having to attend the District high school in the upcoming academic year. Although the IHO found that the CSE was "aware, by at least March 2018, that the [S]tudent was expressing self-harm and was exhibiting aggressive behaviors outside of school," (IHO Op. 20–21), and therefore "had sufficient evidence that the [S]tudent required a therapeutic day program when the [sic] developed the IEP

on June 14, 2018," (*id.* at 21–22), the SRO took a more nuanced view of the record.  For

example, although the hearing record indicated that the Student had a history of "aggressive"

behavior at home—such as tantrums, cursing, and hitting family members—"the information

available to the June 2018 CSE," the SRO explained, "did not indicate that the [S]tudent

exhibited these behaviors in the school setting."  (SRO Op. 18.)  Similarly, the Behavior

Assessment System for Children ("BASC") administered in April 2018 to the Student's mother

and special education teacher—the results of which were reviewed by the CSE—did not indicate

"elevated concerns . . . with regard to aggression or conduct problems on the scale in either

setting."  (*Id.* (record citation omitted) (ellipsis in original).)  Although the CSE discussed Dr.

Parikh's March 2018 report, including its disclosure that the Student had "expressed feelings of

wanting to hurt herself," the "bulk" of the conversation surrounding this report was oriented

toward the parents' concerns over perceived errors in the report.  (*Id.* (record citations omitted).)

That is, the focus of the conversation was "not that the [S]tudent was at risk of killing herself if

she were to attend the high school program," and the director of educational services later

testified that the parent did not voice concern during the meeting that the Student was "at risk of

wanting to hurt herself." (*Id.* (brackets and record citation omitted).)  In addition, although Dr.

Parikh had posed "safety assessment questions," she did not indicate a need for additional safety

evaluation monitoring in her report.  (*Id.* (record citation omitted).)

        In view of this evidence, the SRO found that "it was not until July 2018," when Plaintiffs

filed a letter with the District and subsequently provided an additional letter prepared by Dr.

Cohen, that the Student's mood dysregulation and potential for self-harm were "specifically tied

to the [D]istrict's [high school]."  (*Id.*)  The evidence before the CSE at the time of the June 2018

meeting, by contrast, "show[ed] that the [S]tudent's dysregulation tended to occur in the home

and other non-school environments," and thus, "it [was] not clear why the IHO believed, based upon the information available to the June 2018 CSE, that moving the [S]tudent from a therapeutic in-[D]istrict day program to a therapeutic out-of-[D]istrict program would further improve [the] [S]tudent's behaviors outside of school." (*Id.*)  The SRO found that despite evidence that the Student's dysregulation and expressions of self-harm were only linked to the prospect of attending the District high school *after* the June 2018 IEP had been issued, the IHO had failed to grapple with this distinction, dismissing the District's arguments "in conclusory fashion." (*Id.*)  Thus, "when viewed under the prospective analysis of an IEP required by *R.E.* [*v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012)]," the SRO concluded, "there was insufficient evidence that the June 2018 IEP was inappropriate for the [S]tudent or that . . . [,] in order to offer the [S]tudent a FAPE[,] the [D]istrict was required to place her in an out-of-[D]istrict therapeutic day program due to concerns regarding aggression and/or the potential for self-harm behavior." (*Id.* at 20.)[7]

Turning to consider the September 2018 IEP, the SRO first addressed the IHO's observation that this revised IEP was offered "too late for the parents to reasonably plan for the [S]tudent's program." (*Id.* (quoting IHO Op. 21).)  This statement, the SRO explained, was not "intended as a determination that there were procedural infirmities in scheduling the IEP meetings." (*Id.* at 22; *see also id.* at 21–22 ("The IHO neither ruled that the CSE violated the requirements for conducting a CSE meeting in accordance with the [IDEA's] annual review

---

[7] In *R.E.*, the Second Circuit clarified "that [an] IEP must be evaluated prospectively as of the time of its drafting."  694 F.3d at 186.  Thus, "[r]etrospective evidence that materially alters the IEP"—for example, "evidence that a child *would have had* a specific teacher or specific aide"—"is not permissible."  *Id.* at 187, 188 (emphasis added).  "The appropriate inquiry," rather, "is into the nature of the program actually offered in the written plan."  *Id.* at 187.  Thus, at an IHO hearing, "testimony regarding state-offered services may only explain or justify what is listed in the written IEP."  *Id.* at 185.

procedure, nor held that the [D]istrict failed to have an IEP in effect at the beginning of the

school year for ESY purposes in July or for the 10-month school year in September.").)

"[I]nterpreted appropriately, the IHO's determination was merely that it was too late to remediate

the alleged deficiencies in the [S]tudent's ESY programming when the CSE finished revising the

portion of the IEP that addressed the 10-month school year." (*Id.*)  But even if the IHO's

statement were interpreted to suggest some infirmity in the underlying procedure, the SRO

added, "the evidence in the hearing record would not support a finding that the timing of the CSE

meetings were conducted in a manner inconsistent with the IDEA['s procedural requirements.]"

(*Id.*)  Moreover, to the extent Plaintiffs sought to raise such claims, those claims were not raised

in a timely fashion.  (*See id.* ("The parents did not raise any claims prior to or during the hearing

that the CSE failed to have an IEP in effect at the beginning of the school year or that the CSE

conducted the annual review process in an untimely manner.").)  Finally, the SRO observed that

the parents visited Rye Lake on August 22, 2018, but the revised IEP recommending placement

there was not finalized until September 5, 2018, and thus, Plaintiffs "had two weeks to consider

their misgivings about Rye Lake." (*Id.*)

The SRO also disagreed with the IHO's conclusion that the hearing record lacked

sufficient evidence to "explain how the [S]tudent's social-emotional challenges" with respect to

self-harm and her ASD diagnosis would be addressed at Rye Lake.  (*Id.* at 22.)  As an initial

matter, the SRO noted that the parents' concern regarding the Student's social/emotional

challenges "was very strongly and specifically linked [to] [the Student's] impending attendance

at the [D]istrict's high school and not 'any other high school,'" such as Rye Lake.  (*Id.* at 24

(record citation omitted).)  Nevertheless, the SRO went on to discuss why "the evidence . . .

support[ed] that the September 2018 IEP and the Rye Lake program were designed to address

[the Student's] social/emotional needs [with respect to the risk of self-harm]." (*Id.*)  As the SRO explained, the September 2018 meeting covered various aspects of the Rye Lake program, including the school's student body profile, screening mechanisms, curriculum, vocational training, and therapy services.  (*Id.* at 23.)  The meeting information summary, for example, reflected that Rye Lake's counseling services used cognitive behavior therapy ("CBT"), dialectical behavior therapy ("DBT"), and other evidence-based behavioral approaches to meet the unique needs of individual students.  (*Id.*)  At the meeting, Rye Lake representatives stated that the program "would have implemented the [S]tudent's IEP including her related service mandates, annual goals, and program modifications/accommodations." (*Id.* at 24; *see also* Dist. Ex. 20 ("Sept. 2018 IEP"), at 4; Tr. of IHO Hr'g ("IHO Tr.") 456–58.)[8]  The meeting information summary also reflects that Rye Lake staff members were trained in "TCI," or "Therapeutic Crisis Intervention," (*see* Sept. 2018 IEP 3–4), meaning the staff was trained to "de-escalate students who were emotionally agitated or becoming aggressive," (SRO Op. 24 (citing IHO Tr. 575–76)).  As the Rye Lake principal explained at the Impartial Hearing, the school uses five to seven "response team members" trained in "therapeutic crisis intervention systems" to help students who "enter[] a state of crisis" such that they have "become a danger to themselves or somebody else." (*Id.* (record citation omitted) (alteration in original).)  He also testified that the TSP-I program to which the Student was admitted had a psychologist, social worker, registered nurse, and school counselor on staff.  (*Id.*)  In view of this and other evidence

---

[8] Pursuant to an Order issued by the Court, (Dkt. No. 14), the Parties provided the Court with the underlying administrative record in this case.  This hard-copy record is on file with the Court.  The designation "Dist. Ex." refers to the District's Exhibits at the Impartial Hearing.  Note that District Exhibit 20 contains the meeting information summary from the September 5, 2018 CSE meeting, followed immediately by the September 2018 IEP itself.  The Court cites this document generally as the "Sept. 2018 IEP."

regarding Rye Lake's ability to implement the various provisions of the Student's IEP, the SRO concluded that "the IHO's criticisms of the lack of information regarding Rye Lake were not well supported." (*Id.* at 25.) The SRO also noted that a District psychologist had testified that Rye Lake was an appropriate placement "because it provided 'immense wrap-around therapeutic support,' including DBT, CBT[,] and social skills groups that were 'informed' by those therapeutic methods"—points that were "also referenced in the proposed [September 2018] IEP." (*Id.* (citing IHO Tr. 459–60; Sept. 2018 IEP 3).) This psychologist indicated that such techniques were especially important for the Student in part because her own private neuropsychiatrist had recommended them to help develop the Student's emotional regulation, executive functioning, and distress tolerance, among other skills. (*Id.*)

The SRO also found, contrary to the IHO, that the District had presented adequate evidence of how Rye Lake would address the Student's social-emotional challenges stemming from ASD. (*Id.* at 25.) Record evidence indicated, for example, that the Rye Lake psychologist "had been aligned with an autism specific program for over [10] years," and staff at the school had experience with autistic students. (*Id.* (record citation omitted).) A District psychologist who participated in the Rye Lake intake process stated that the program would address the Student's needs because it provided a "highly structured, highly therapeutic, very consistent and predictable" setting in which the Student would receive an individualized curriculum and extensive support from teachers and teaching assistants. (*Id.* at 25–26 (record citation omitted).) With respect to improving the Student's peer interaction skills, Rye Lake provided social skills group counseling sessions. (*Id.* at 26.) And with respect to the Student's avoidance/phobia difficulties, the Rye Lake school psychologist had described how he had successfully addressed the needs of a student with similar difficulties in the past, and said that if the Student struggled

with avoidance issues at Rye Lake, the program would maintain ongoing contact with the family

to provide coaching, interventions, and other strategies to address the issue.  (*Id.*)  Moreover,

evidence showed that Rye Lake used a number of strategies to address school avoidance, such as

"incentives for walking into the school building, creating a flexible schedule to take off some of

the academic pressures, and conducting therapy sessions in the parking lot."  (*Id.*)  Accordingly,

the SRO concluded that,

> contrary to the IHO's conclusions, the evidence in [sic] described reflects that the
> September 2018 IEP provided an out-of-[D]istrict setting with a small student to
> staff ratio in a supervised environment that addressed the [S]tudent's needs in great
> detail and that Rye Lake was capable of implementing that IEP with a highly trained
> staff having experience in, among other things, crisis intervention and numerous
> therapeutic approaches.

(*Id.*)  The SRO therefore reversed the IHO's determinations to the contrary.  (*Id.*)

Finally, with respect to the IHO's determination that Rye Lake was also an inappropriate

placement because the Student would not have been grouped with similarly situated peers, the

SRO held that because the "[S]tudent never actually attended Rye Lake . . . , with the record

before [him], any alleged grouping claim [was] impermissibly speculative."  (*Id.* at 28.)  The

SRO explained that under Second Circuit law, administrative review officers may not consider

"such retrospective evidence."  (*Id.* (citation omitted) (gathering authorities).)  But although he

rejected Plaintiffs' argument on the ground that it was "impermissibly speculative," the SRO also

considered—and rejected—the argument on its merits, concluding that the evidence showed that

"Rye Lake was at least capable of appropriately grouping the [S]tudent."  (*Id.*)  For example, the

Rye Lake principal testified that when the school determines whether to accept a student, the

school considers whether "the student [will] have a natural peer group or [a] peer group that

[they] could socially engineer."  (*Id.* (record citation omitted) (first and third alterations in

original).)  He also testified that the school had accepted the Student based on the school's belief

that it had a similar group of students with whom the Student could be placed.  (*Id.* at 29.)
Having considered this evidence, the SRO concluded that "had the [S]tudent attended the
program, Rye Lake was capable of grouping the [S]tudent in compliance with the state's
grouping requirements."  (*Id.* at 29.)

In light of his findings, the SRO found that both the June 2018 and September 2018 IEPs
offered the Student a FAPE at the time they were offered.  (*Id.*)  Because the District did not
challenge the IHO's determinations regarding the Student's unilateral placement at Pinnacle and
the attendant equitable considerations, the SRO did not review these determinations.  (*See id.*)
The SRO therefore reversed the IHO decision insofar as it found that the District had denied the
Student a FAPE and had ordered the District to reimburse the parents for tuition and
transportation costs.  (*Id.*)

B.  Procedural History

Plaintiffs filed their Complaint on March 11, 2020, asserting that "the SRO's decision is
in violation of the IDEA and the laws of the State of New York."  (Compl. ¶ 2.)  On June 25,
2020, counsel for Defendant filed a letter notifying the Court that Plaintiffs would waive the
filing of an Answer and, with the Court's permission, would proceed directly to summary
judgment motion practice.  (Letter from Mark C. Rushfield, Esq., to Court (June 25, 2020) 1
(Dkt. No. 6).)  The Court approved the Parties' proposed briefing schedule the same day.  (Dkt.
No. 7.)  On August 31, 2020, Plaintiffs filed the instant Motion and supporting papers.  (Not. of
Mot.; Pls.' Mem. of Law in Supp. of Mot. for Summ. J. ("Pls.' Mem.") (Dkt. No. 9); Pls.' Local
Civil Rule 56.1 Statement in Supp. of Mot. ("Pls.' 56.1") (Dkt. No. 10).)  Defendant filed its
Opposition papers on October 21, 2020.  (Def.'s Mem. of Law in Opp'n to Pls.' Mot. for Summ.
J. ("Def.'s Opp'n") (Dkt. No. 11); Def.'s Counter 56.1.)  Plaintiffs filed a short document styled

as a "Response to Defendant's Counterstatements" on December 29, 2020.  (Resp. to Def.'s

Counterstatements ("Pls.' Reply") (Dkt. No. 13).)[9]  On April 14, 2021, the Court issued an Order

instructing the Parties to provide the full administrative record to the Court.  (Dkt. No. 14.)

## II.  Discussion

### A.  Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public

education"—a "FAPE," for short—to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A);

*see also Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993

(2017).  A FAPE "includes both 'special education' and 'related services,'" which a state must

provide to a disabled child "'in conformity with the child's individualized education program,' or

IEP."  *Endrew F.*, 137 S. Ct. at 994 (alteration omitted) (quoting § 1401(9)(D)).  "School

districts, through a CSE, are responsible for formulating a written IEP for every qualifying

child."  *L.O.*, 822 F.3d at 102 (footnote omitted); *see also* 20 U.S.C. § 1414(d) (same).[10]  "The

IEP sets out the child's present educational performance, establishes annual and short-term

objectives for improvements in that performance, and describes the specially designed

instruction and services that will enable the child to meet those objectives."  *L.O.*, 822 F.3d at

---

[9] Rather than filing a reply memorandum of law, Plaintiffs have instead filed a set of
replies to certain statements offered by Defendant in its Counter 56.1 Statement.  Plaintiffs
elected to respond "only [to] those statements and counterstatements" where the District
allegedly "misstated facts."  (Pls.' Reply 1.)

[10] "In New York, the state has assigned responsibility for developing IEPs to local CSEs.
CSEs are comprised of members appointed by the local school district's board of education, and
must include the student's parent(s), a regular or special education teacher, a school board
representative, a parent representative, and others."  *L.O.*, 822 F.3d at 102 n.4 (alteration,
citations, and quotation marks omitted); *see also* N.Y. Educ. Law § 4402(1)(b)(1)(a).

102–03 (quotation marks omitted); *see also Endrew F.*, 137 S. Ct. at 994 (listing statutory criteria governing IEPs).

"The IDEA . . . requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001; *see also Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 757 (2d Cir. 2018) ("Prior decisions of this Court are consistent with the Supreme Court's decision in *Endrew F.*"); *L.O.*, 822 F.3d at 103 ("To comply with the provisions of the IDEA, the IEP must be reasonably calculated to enable the child to receive educational benefits." (quotation marks omitted)).  There is no "bright-line rule" determining "what 'appropriate' progress" means; rather, "[t]he adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001; *see also S.C. v. Katonah-Lewisboro Cent. Sch. Dist.*, 175 F. Supp. 3d 237, 250 (S.D.N.Y. 2016) ("The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP." (citation omitted)), *aff'd sub nom. J.C. v. Katonah-Lewisboro Sch. Dist.*, 690 F. App'x 53 (2d Cir. 2017) (summary order).  The Supreme Court has explained that "[f]or children receiving instruction in the regular classroom, this would generally require an IEP reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Endrew F.*, 137 S. Ct. at 996 (citation and quotation marks omitted).  But, for "a child who is not fully integrated in the regular classroom and not able to achieve on grade level . . . his [or her] IEP . . . must be appropriately ambitious in light of his [or her] circumstances." *Id.* at 1000.  In other words, an IEP "providing merely more than de minimis progress from year to year" is insufficient, *id.* at 1001 (italics and quotation marks omitted), but, it also need not "furnish[] . . . every special service necessary to maximize each handicapped child's potential," *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458

U.S. 176, 199 (1982), or "provide[] everything that might be thought desirable by loving

parents," *S.C.*, 175 F. Supp. 3d at 250 (citation omitted).  Moreover, "[b]ecause the law

expresses a strong preference for children with disabilities to be educated, 'to the maximum

extent appropriate,' together with their non-disabled peers, special education and related services

must be provided in the least restrictive setting consistent with a child's needs," and "[o]nly

'when the nature or severity' of a child's disability is such 'that education in regular classes with

the use of supplementary aids and services cannot be achieved satisfactorily' should a child be

segregated." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting

20 U.S.C. § 1412(5)).

"[The] IDEA also provides a variety of procedural safeguards with respect to the

provision of [a FAPE] by school districts." *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of

Educ.*, 397 F.3d 77, 81–82 (2d Cir. 2005) (citation omitted); *see also* 20 U.S.C. § 1415 (listing

safeguards).  "[A]dequate compliance with the procedures prescribed would in most cases assure

much if not all of what Congress wished in the way of substantive content in an IEP." *Rowley*,

458 U.S. at 206.  On the other hand, not "every procedural error in the development of an IEP

renders that IEP legally inadequate under the IDEA," *A.C. ex rel. M.C. v. Bd. of Educ. of The

Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009) (citation omitted), although

"[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the

violations considered individually do not," *R.E.*, 694 F.3d at 190.  Specifically, a procedural

violation violates the IDEA only if it

> ([i]) impeded the child's right to a free appropriate public education;
> ([ii]) significantly impeded the parents' opportunity to participate in the
> decisionmaking process regarding the provision of a free appropriate public
> education to the parents' child; or
> ([iii]) caused a deprivation of educational benefits.

*Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 525–26 (2007) (citation

and quotation marks omitted).  In New York, if a parent believes that his or her child is being

denied a FAPE, the parent may request an "[i]mpartial due process hearing," 20 U.S.C.

§ 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a).

The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law

§ 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20

U.S.C. § 1415(i)(2)(A).  *See also L.O.*, 822 F.3d at 103 (describing the appeal process).

### B.  Standard of Review

The Court's inquiry under the IDEA is limited to addressing (1) whether the District

"complied with the procedures set forth in the Act" and (2) whether the IEP "developed through

the Act's procedures [was] reasonably calculated to enable the child to receive educational

benefits."  *Rowley*, 458 U.S. at 206–07.  Unlike with an ordinary summary judgment motion, the

existence of a disputed issue of material fact will not necessarily defeat a motion for summary

judgment in the IDEA context.  *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554

F.3d 247, 252 (2d Cir. 2009) (per curiam); *see also G.B. ex rel. N.B. v. Tuxedo Union Free Sch.*

*Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010) (same), *aff'd*, 486 F. App'x 954 (2d Cir. 2012)

(summary order).  Instead, summary judgment in IDEA cases is "in substance an appeal from an

administrative determination, not a summary judgment."  *Lillbask*, 397 F.3d at 83 n.3 (quotation

marks omitted); *see also G.B.*, 751 F. Supp. 2d at 570 (same).  The Court's review therefore

"requires a more critical appraisal of the agency determination than clear-error review but falls

well short of complete de novo review."  *L.O.*, 822 F.3d at 108 (quotation marks and italics

omitted).  Accordingly, the Court must "engage in an independent review of the administrative

record and make a determination based on a preponderance of the evidence." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012) (citation omitted).

However, such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. "To the contrary, federal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *M.H.*, 685 F.3d at 240 (citation and quotation marks omitted). To merit deference, the IHO's and SRO's decisions must be "thorough and careful." *S.C.*, 175 F. Supp. 3d at 252 (citation omitted). The quality of the decision can be judged on factors such as whether it is "well-reasoned" and "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189 (citation omitted); *L.O.*, 822 F.3d at 109 ("To merit deference, the SRO's or IHO's factual findings must be reasoned and supported by the record." (citation, alteration, and quotation marks omitted)). Additionally, the Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when the substantive adequacy of an IEP, as opposed to the procedural adequacy, is at issue; when the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when the district court's decision is based solely on the administrative record that was before the SRO. *See M.H.*, 685 F.3d at 244.

Where, as here, the IHO and SRO reach contrary conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* at 246; *see also A.C.*, 553 F.3d at 171 (noting

26

that "[i]f the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision

may be afforded diminished weight," because the court must "defer to the final decision of the

state authorities" (citations and quotation marks omitted)).  However, if the Court concludes that

> the SRO's determinations are insufficiently reasoned to merit . . . deference, and in
> particular where the SRO rejects a more thorough and carefully considered decision
> of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's
> conclusions unpersuasive even after appropriate deference is paid, to consider the
> IHO's analysis.

*M.H.*, 685 F.3d at 246.  Therefore, this Court "must defer to the SRO's decision on matters

requiring educational expertise unless it concludes that the decision was inadequately reasoned,

in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189;

*see also C.L. v. N.Y.C. Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, at *5 (S.D.N.Y. Jan.

3, 2013) ("[T]he Second Circuit [has] explained that the deference owed to an SRO's decision

depends on the quality of that opinion, or its persuasiveness." (citation and quotation marks

omitted)), *aff'd*, 552 F. App'x 81 (2d Cir. 2014) (summary order).

    C.  Analysis

    "Parents who believe that a FAPE is not being provided to their child may unilaterally

enroll the child in a private school and seek tuition reimbursement from the school district."

*M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (citation and alteration omitted).

To determine whether reimbursement is warranted, courts apply a three-part test known as the

*Burlington*/*Carter* test.  *See T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014);

*see also Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–71 (1985);

*Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16 (1993).  According to this test, "the

parents will be entitled to reimbursement if (1) the school district's proposed placement violated

the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable

considerations favor reimbursement." *T.M.*, 752 F.3d at 152.

Here, the District did not challenge the IHO's conclusions that Pinnacle was an

appropriate alternative placement and that equitable considerations favored reimbursement.

(SRO Op. 29.)  Thus, the Court need only consider the first prong of the *Burlington/Carter* test.

Under this prong, courts "determin[e] whether an IEP complies with the IDEA" through "a two-

part inquiry that is, first, procedural, and second, substantive." *M.W. ex rel. S.W. v. N.Y.C. Dep't

of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013) (quoting *R.E.*, 694 F.3d at 189–90); *see also J.C. v.

N.Y.C. Dep't of Educ.*, 643 F. App'x 31, 32 (2d Cir. 2016) (summary order) (noting two-part

inquiry under first prong of the *Burlington/Carter* test); *Q.W.H. v. N.Y.C. Dep't of Educ.*, No. 15-

CV-1876, 2016 WL 916422, at *6 (S.D.N.Y. Mar. 7, 2016) (same).  "At the first step, courts

examine whether there were procedural violations of the IDEA, namely, whether the state has

complied with the procedures set forth in the IDEA." *R.E.*, 694 F.3d at 190 (citation and

quotation marks omitted).  Under the second part, courts consider whether the IEP was

substantively adequate, that is, whether it was "reasonably calculated to enable the child to

receive educational benefits." *Id.* (citation, quotation marks, and alterations omitted).

Challenging the SRO's decision, Plaintiffs argue that each of the CSE's meetings—on June 14,

July 31, and September 5 of 2018—"resulted in IEPs that were procedurally and substantively

deficient," and thus, the District failed to provide the Student a FAPE for the 2018–19 school

year.  (Pls.' Mem. 4–5.)

### 1.  Procedural Adequacy

This "initial procedural inquiry . . . is no mere formality, as adequate compliance with the

procedures prescribed would in most cases assure much if not all of what Congress wished in the

way of substantive content in an IEP." *A.C.*, 553 F.3d at 172 (citation and quotation marks

omitted).  As noted, however, not "every procedural error in the development of an IEP renders

that IEP legally inadequate under the IDEA." *Id.* (citation omitted).  For procedures to prove

sufficient, they must provide

> [a]n opportunity for the parents of a child with a disability to examine all records
> relating to such child and to participate in meetings with respect to the
> identification, evaluation, and educational placement of the child, and the provision
> of a [FAPE] to such child, and to obtain an independent educational evaluation of
> the child.

20 U.S.C. § 1415(b)(1).  Procedural violations warrant reimbursement only if they "impeded the

child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the

decisionmaking process," or "caused a deprivation of educational benefits."  *R.E.*, 694 F.3d at

190 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see also M.W.*, 725 F.3d at 139 ("[P]arents must

articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the

decision-making process.").  "Multiple procedural violations may cumulatively result in the

denial of a FAPE even if the violations considered individually do not."  *Id.* (citation and

brackets omitted).

 As an initial matter, the Court notes that Plaintiffs have not been particularly precise in

specifying which of their challenges are procedural and which are substantive.  Indeed, the two

categories often appear intermingled in Plaintiffs' brief, and, to a large extent, the Court has been

left to draw these distinctions on its own.  Nevertheless, the Court understands Plaintiffs to raise

a handful of distinct procedural challenges, each of which is addressed below.

### a.  June 2018 CSE Meeting and IEP

 First, with respect to the June 2018 IEP, Plaintiffs argue that the CSE "failed to

adequately consider the information it had on-hand in developing the Student's IEP."  (Pls.'

Mem. 6.)  In particular, Plaintiffs argue that the CSE (1) "completely disregarded the recommendations of Dr. Janke, [and] did not request any further information about [her] recommendations or findings"; and (2) "did not discuss that the Student had expressed self-harm ideation."  (*Id.* at 7.)  As a result, Plaintiffs argue, the CSE "failed to adequately consider the social development and managerial or behavioral needs of the Student."  (*Id.*)

Taking Plaintiffs' claims in reverse order, the Court first notes that the CSE did cover the Student's "self-harm ideation" during the June 2018 meeting.  According to the meeting information summary, one of the CSE members "reviewed Dr. Parikh's [March 2018] report," which "indicated that the [Student's] parent shared [that] the [S]tudent [had] expressed feelings of wanting to hurt herself."  (Dist. Ex. 21 ("June 2018 Meeting Summ."), at 3 (summarizing discussion); *see also* IHO Tr. 601:8–22, 604:25–605:10 (recalling the relevant discussion at the June 2018 meeting, including the disclosure regarding the Student's self-harm ideation).)  The meeting summary also notes that "[t]he school [had not been] aware of this [fact] until [Dr. Parikh's] report."  (June 2018 Meeting Summ. 3.)  Thus, Plaintiffs' claim that the "CSE did not discuss that the Student had expressed self-harm ideation during the meeting," (Pls.' Mem. 7), is belied by the record.  This argument also ignores relevant contextual information.  For example, Dr. Parikh's report indicated that the Student had "no prior history of self harm behaviors, suicide attempts or any inpatient psychiatric admission."  (Dist. Ex. 15 ("Parikh Report"), at 1.)  And despite the fact that Dr. Parikh had administered "safety assessment questions" to the Student, (*see id.*), her report "did not indicate a need for further safety evaluation monitoring," (SRO Op. 19.)  Moreover, although the CSE did discuss Dr. Parikh's report at the June 2018 meeting, the focus of this discussion apparently revolved around one of Plaintiff's critiques of the report, (*see* SRO Op. 18; *see also* June 2018 Meeting Summ. 3).  That is, when given an

opportunity to address Dr. Parikh's report at the meeting, the Student's mother did not express concern "that [the Student] was at risk or wanting to hurt herself," (IHO Tr. 602:20–24), but instead highlighted various perceived deficiencies in the report, (*see* June 2018 Meeting Summ. 3).

Critiquing the SRO's decision, Plaintiffs argue that the SRO "improperly minimized the weight of the evaluations reviewed" at the meeting, "relieved the CSE of its obligation to address all social-emotional needs of the Student[,] and placed the burden on the Parents to focus on the Student's self-harm ideation at the meeting." (Pls.' Mem. 9.)  But this argument sounds more in substance than procedure.  There is no allegation, for example, that the Parents or private neuropsychologist were denied an opportunity to participate in the meeting or offer their input. Indeed, the meeting summary reflects that Dr. Janke and the Student's mother did participate. (*See* June 2018 Meeting Summ. 1–3.)

What Plaintiffs actually seem to challenge, then, is not the CSE's procedures, but the way in which it ultimately weighed the evidence before it.  This "weighing of conflicting evidence," however, "is exactly the sort of area in which" the Court should "defer to the SRO—the education professional—rather than pretend to transform [itself] into some sort of educational specialist." *W.S. ex rel. C.S. v. Rye City Sch. Dist.*, 454 F. Supp. 2d 134, 145 (S.D.N.Y. 2006). In a thorough, well-reasoned opinion, the SRO explained not only why the CSE's June 2018 determination was reasonable, but also why the IHO's own analysis was flawed.  As noted, the SRO emphasized that: (1) "the [S]tudent herself had not expressed suicidal ideation to anyone in the [D]istrict up through the June 2018 CSE meeting"; (2) Dr. Parikh "had conducted a further safety assessment based upon the [P]arent's report during the evaluation and did not identify a safety concern that required additional mitigation at that time"; (3) Dr. Janke—who had

reportedly reviewed Dr. Parikh's report—expressed "no concerns regarding the likelihood that the [S]tudent would engage in self[-]harm" either in her May 2018 addendum or in her discussion during the June 2018 meeting; and (4) even though Dr. Janke and the Student's mother participated in the June 2018 meeting, the "bulk" of the conversation around Dr. Parikh's report involved the mother's concerns regarding the perceived errors in the report, rather than the Student's self-harm ideation.  (SRO Op. 18–19.)  The SRO found that although the IHO had discussed Dr. Janke's evaluation "at length," he failed to "grapple" with these other, countervailing factors.  (*See id.* at 19.)  Here, the SRO's conclusions are supported by the record and "grounded in thorough and logical reasoning."  *M.H.*, 685 F.3d at 244 (observing that such determinations are entitled to deference).  Where, as here, "an SRO has evaluated the evidence presented by both sides and made a reasoned judgment, this Court may not second-guess that decision."  *H.C. v. Katonah-Lewisboro Union Free Sch. Dist.*, No. 09-CV-10563, 2012 WL 2708394, at *14 (S.D.N.Y. May 24, 2012), *aff'd*, 528 F. App'x 64 (2d Cir. 2013) (summary order); *see also D.A.B. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 344, 363 (S.D.N.Y. 2013) ("[B]ecause the SRO's determination . . . was supported by the evidence, the conclusion will not be disturbed.").  The Court is unpersuaded that the CSE did not give adequate consideration to the Student's expressions of self-harm.

As noted, Plaintiffs also make a procedural argument based on the assertion that the CSE "completely disregarded the recommendations of Dr. Janke, [and] did not request any further information about [her] recommendations or findings."  (Pls.' Mem. 7.)  This argument is unpersuasive for several reasons.  As discussed, Dr. Janke provided input during a portion of the June 2018 meeting, (*see* June 2018 Meeting Summ. 1–2), and her report and subsequent addendum made up part of the evaluative information the CSE considered when formulating the

Student's IEP, (*see* SRO Op. 12–13, 14–15).  As a procedural matter, therefore, Plaintiffs are

hard-pressed to argue that the results of Dr. Janke's evaluations were not "considered by the

public agency . . . in any decision made with respect to the provision of [a] FAPE."  34 C.F.R.

§ 300.502(c)(1).  "Consideration," moreover, "does not require [that there be] substantive

discussion, that every member of the CSE read the document, or that the CSE accord the private

evaluation any particular weight."  *S.W. v. N.Y. Dep't of Educ.*, 92 F. Supp. 3d 143, 158

(S.D.N.Y. 2015); *see also J.S. v. N.Y.C. Dep't of Educ.*, 104 F. Supp. 3d 392, 404 n.3 (S.D.N.Y.

2015) (observing that a CSE is "not required to give [an] independent evaluation any particular

weight or afford any deference to its recommendations").  Indeed, it is well-established that this

Court should defer to the District, not to a private expert.  *See G.W. v. Rye City Sch. Dist.*, No.

11-CV-8208, 2013 WL 1286154, at *19 (S.D.N.Y. Mar. 29, 2013) ("The [c]ourt is not at liberty

to favor Dr. Scalzo's opinion, a privately hired expert, over the deference that should

appropriately be accorded to the [d]istrict in matters of educational policy."), *aff'd*, 554 F. App'x

56 (2d Cir. 2014) (summary order); *McCallion v. Mamaroneck Union Free Sch. Dist.*, No. 10-

CV-6207, 2013 WL 237846, at *10 (S.D.N.Y. Jan. 22, 2013) (rejecting argument that "the SRO

erred by relying too heavily on the evaluations and opinions of the [d]istrict's witnesses while

giving little or no weight to the conclusions of [the] [p]arent's experts" because the court defers

to the district, not to a private expert); *E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F.

Supp. 2d 417, 436 (S.D.N.Y. 2010) ("The mere fact that a separately hired expert has

recommended different programming does nothing to change the deference to the district and its

trained educators." (alterations and quotation marks omitted) (quoting *Watson v. Kingston City

Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004), *aff'd*, 142 F. App'x 9 (2d Cir. 2005)

(summary order))).  Here, "Plaintiffs are arguing that the CSE did not adopt, or at least give

enough credence to, Dr. [Janke's] recommendation[s].  However, the CSE was not required to do

so, and therefore, this cannot establish a procedural violation of the IDEA."  *Y.N. v. Bd. of Educ.*

*of Harrison Cent. Sch. Dist.*, No. 17-CV-4356, 2018 WL 4609117, at *20 (S.D.N.Y. Sept. 25,

2018); *see also M.B. v. N.Y.C. Dep't of Educ.*, No. 14-CV-3455, 2017 WL 384352, at *6

(S.D.N.Y. Jan. 25, 2017) (finding no procedural violation where the CSE did not consider the

evaluation in question because it was not "required to defer to the recommendations and

evaluations proffered by the parents").  Accordingly, this argument of Plaintiffs is also

unavailing.

### b.  July 2018 Meeting

Plaintiffs also raise a procedural argument based on the July 31, 2018 meeting.  As noted,

a letter from another private psychiatrist, Dr. Cohen, was read aloud at this meeting.  (*See* Def.'s

Counter 56.1 § II.B.8.)  In that letter, Dr. Cohen opined that the District high school's "large

setting . . . could be detrimental to the [Student's] academic and social progress."  (Dist. Ex. 17

("Cohen Letter"), at 1.)  Plaintiffs argue that the District "[o]nce again . . . failed to adequately

consider the Student's social development and behavioral/managerial needs" because: (1) the

District "did not seek any more information regarding the basis for the psychiatrist's opinion that

placement at the District public high school 'could be detrimental to the [Student's] academic

and social progress'"; and (2) the District's Special Education Director, Dr. Rukmini Bhalla

"was unable to articulate the CSE's understanding of the psychiatrist's letter."  (Pls.' Mem. 10.)

This argument fails for the same reason as Plaintiffs' similar argument regarding Dr. Janke:

Although a private evaluation "[m]ust be considered by the public agency . . . in any decision

made with respect to the provision of [a] FAPE," 34 C.F.R. § 300.502(c)(1), "[c]onsideration

does not require [that there be] substantive discussion, that every member of the CSE read the

document, or that the CSE accord the private evaluation any particular weight," *S.W.*, 92 F.

Supp. 3d at 158.  Although Plaintiffs suggest that members of a CSE are required to probe into

the basis for a private psychiatrist's conclusions or subsequently articulate the CSE's collective

understanding of the psychiatrist's evaluation, (*see* Pls.' Mem. 10), they cite no authority for this

belief, which is inconsistent with the principle that a CSE need not accord any particular weight

to a private evaluation.  Separately, the notion that the CSE did not understand or heed Dr.

Cohen's recommendation is puzzling in light of two considerations.  First, Dr. Cohen's letter is

not complex or ambiguous.  It contains two short paragraphs in which Dr. Cohen opines that the

Student's "complex medical and neuropsychiatric case . . . cannot be well managed in a public-

school setting, or even in a therapeutic support setting due to the excess stimuli of such a large

setting.  (Cohen Letter 1.)  Though Plaintiffs criticize the District for not seeking more

information about the basis for Dr. Cohen's belief that the District high school "could be

detrimental to the [Student's] academic and social progress," (Pls.' Mem. 10 (citation omitted)),

the CSE might reasonably have concluded that such inquiry was unnecessary in light of the

letter's relatively clear meaning, (*see* IHO Tr. 660:2–6 (Q: "Did they elaborate on what Dr.

Cohen meant when he said it would be detrimental?"  A: "I think just based on the context of the

conversation that we were having.")).  Moreover, insofar as Plaintiffs believe Dr. Cohen's letter

concealed some unstated rationale that should have been discussed at the July 2018 meeting, it

would have made sense to have Dr. Cohen supplement his letter, or to raise this rationale

themselves at the meeting.  As noted, however, Plaintiffs offer no support for the notion that the

CSE must divine this unstated rationale itself.  Second, Plaintiffs' argument is bewildering in

light of the fact that the CSE, based on the information presented at the July 2018 meeting,

decided to search for an out-of-District placement.  The obvious inference is not only that the

CSE *did* consider Dr. Cohen's recommendation, but that it took his recommendation to heart. Plaintiffs' argument to the contrary is unpersuasive.

### c.  September 2018 IEP

### i.  Adequacy of Information in the September 2018 IEP

The Court construes Plaintiffs' Memorandum of Law to raise a third procedural argument based on the alleged inadequacy of the information provided in the September 2018 IEP document.  (*See* Pls.' Mem. 11–12.)  Specifically, Plaintiffs argue that this document "failed to provide [them] with specific information about how the Student's social-emotional needs would be addressed" at the Rye Lake program.  (*Id.* at 11.)  Though Plaintiffs concede that the document "lists descriptions of the programmatic supports offered by [Rye Lake]," they maintain that the document does not adequately explain "how these supports would address the unique needs of the Student."  (*Id.* at 11–12; *see also id.* at 12 ("More than anything the IEP just provides a generic list of possible supports without any regard to connecting those supports to the Student's unique needs.").)  Although Plaintiffs also dispute whether the strategies and supports listed in the September 2018 IEP were adequate to address the Student's needs, that is a separate argument which goes to the substantive adequacy of the proposed program.  Their procedural argument, rather, is that the IEP document itself did not contain sufficient information to inform their decision-making.

However, the Court finds that Plaintiffs did not raise this argument in their Due Process Complaint, and thus, they are precluded from raising the argument here.  *See J.G. v. Brewster Cent. Sch. Dist.*, No. 15-CV-3612, 2018 WL 749010, at *10 (S.D.N.Y. Feb. 7, 2018) (finding that plaintiffs were "precluded from alleging that [a] [d]istrict failed to provide a FAPE during the 2011-2012 school year because they failed to raise the issue below in their [d]ue [p]rocess

[c]omplaint"); *Q.W.H.*, 2016 WL 916422, at *9 (finding that one of plaintiffs' arguments "was waived because it was not raised in the [due process complaint]").  The closest argument comes in paragraph 24 of the Due Process Complaint, where Plaintiffs assert that the September 2018 IEP "was substantively deficient in many other areas" apart from its inappropriate placement recommendation.  (Dist. Ex. 1 ("DPC") ¶ 24.)  As Plaintiffs argued,

> the annual goals were minimal, vague[,] and failed to address many of the deficit areas that the Student exhibited during Dr. Janke's evaluation.  Additionally, the IEP failed to outline implementable strategies to achieve these goals.  Finally, the CSE failed to develop goals designed to address the impact of the Student's needs associated with her ASD diagnosis or goals designed to address the Student's coping with her significant anxiety and phobias.

(*Id.*)  Thus, Plaintiffs' original argument focused on the (1) alleged vagueness of goals in the IEP, (2) the alleged absence of "implementable strategies" to achieve those goals, and (3) the alleged absence of goals to address the Student's ASD, anxiety, and phobias.  (*See id.*)  Plaintiffs' current argument, by contrast, does not focus on the goals listed in the September 2018 IEP.  The argument, rather, is that the IEP "did not provide adequate information about how the supports at Rye Lake . . . would enable the Student to make meaningful progress in light of her unique circumstances.  (Pls.' Mem. 12.)

It is axiomatic that "issues not raised in due process complaints are foreclosed from review in federal court, absent agreement from the opposing party."  *Davis v. Carranza*, No. 19-CV-10123, 2021 WL 964820, at *6 (S.D.N.Y. Mar. 15, 2021) (alteration omitted) (quoting *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 78 (2d Cir. 2014)).  A due process complaint must "list the alleged deficiencies with enough specificity so that the [defendant] is able to understand the problems and attempt to remedy them."  *Id.* (quoting *T.G. ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 320, 337 (S.D.N.Y. 2013)).  The Court finds that Plaintiffs failed to raise the instant procedural argument with sufficient specificity in the Due Process Complaint.

It is true that courts will still consider a claim not raised in a due process complaint where "(1) the due process complaint provides fair notice to the school district of the argument at issue; (2) both the IHO and SRO reach the issue on the merits, giving the federal court a record for review; or (3) the argument goes to the heart of the dispute."  *Davis*, 2021 WL 964820, at *6 (citation and alterations omitted).  None of these exceptions applies here, however.  First, for reasons already stated, the argument in paragraph 24 of the Due Process Complaint does not provide fair notice of the procedural argument Plaintiffs now raise here, which involves a separate aspect of the September 2018 IEP.  Second, neither the IHO nor the SRO addressed the current argument.  The IHO found "that placement at Rye Lake did not offer the [S]tudent a FAPE because the evidence presented by the District and Rye Lake did not sufficiently explain how the [S]tudent's social-emotional challenges regarding self-harm and her ASD would be addressed at Rye Lake."  (*See* IHO Op. 22.)  But the IHO made this finding with respect to the evidence presented during the impartial hearing, and did not address the September 2018 IEP document itself.  Following the District's appeal to the SRO, Plaintiffs raised the instant argument in their Answer, and then made the same point in their Memorandum of Law.  (*See* Verified Answer ¶ 20 (App. No. 19-086) ("The September 2018 IEP meeting comments provide an overview of the program and a list of services offered by Rye Lake, but fail to specify how this program and these services would be used to address Student's abilities and unique circumstances."); Respondent's Mem. of Law 24 (App. No. 19-086) (same).)  Although the SRO gave a detailed summary of the information in the September 2018 IEP document and the corresponding meeting summary, (*see* SRO Op. 22–24), and ultimately concluded that the recommended strategies and supports were substantively adequate, (*see id.* at 24–26), he did not explicitly address Plaintiffs' current argument or make a determination as to whether the IEP

document itself contained adequate information to inform Plaintiffs' decision-making.  Finally,

in the Court's view, the current argument does not go to the heart of the dispute, which is

whether the strategies and supports recommended in the September 2018 IEP were substantively

adequate so as to provide the Student with a FAPE.

Because Plaintiffs' third procedural argument was not properly raised in the Due Process

Complaint, the Court need not consider this argument here.[11]

---

[11] Even if Plaintiffs had raised their third procedural argument in their Due Process
Complaint, this argument is unpersuasive.  An IEP must include:

> (1) the student's present levels of academic achievement and functional
> performance; (2) measurable annual goals for the child; (3) the method used to
> measure the student's progress toward those goals; (4) the special education and
> related services that the IEP recommends; (5) an explanation of the extent to which
> the student will be educated with "nondisabled" peers; (6) the reasons for any
> alternate assessments; and (7) the start date for recommended services, their
> duration, and their frequency.

*P.G. v. N.Y.C. Dep't of Educ.*, 959 F. Supp. 2d 499, 512 (S.D.N.Y. 2013) (citing 20 U.S.C.
§ 1414(d)(1)(A); N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8 § 200.4(d)(2) (2021)).  The
September 2018 IEP contains each of these required components.  The Student's present levels
of academic achievement and functional performance are set forth on pages one through 10 of
the IEP—which, as noted *supra* note 8, immediately follows the meeting notes from the
September 5, 2018 CSE meeting.  (*See* Sept. 2018 IEP 15–24.)  The Student's measurable annual
goals, the criteria by which they are measured, the method for measuring her progress, and the
schedule for measuring such progress are all set forth on pages 14 and 15.  (*See id.* at 28–29.)
The Student's recommended special education and related services are set forth on pages 16
through 18.  (*See id.* at 30–32.)  An explanation regarding the extent to which the Student would
be educated with nondisabled peers is set forth on page 20.  (*See id.* at 34.)  A statement
regarding the Student's participation in State and district-wide assessments is set forth on page
20.  (*See id.*)  And finally, the start date, duration, and frequency of the recommended special
education and related services are set forth on pages 16 through 18.  (*See id.* at 30–32.)  Thus, the
September 2018 IEP contained all that was required of it.  Plaintiffs' vague and conclusory
assertion that the September 2018 IEP "fail[ed] to provide sufficient information about how [the
recommended services] would address the unique needs of the Student," (Pls.' Mem. 11–12),
attempts to impose more upon the IEP than the law requires.  Another court in this District has
considered—and rejected—a similar argument.  *See P.G.*, 959 F. Supp. 2d at 511–12 (rejecting
the plaintiffs' argument that an IEP was inadequate because it "failed to acknowledge" certain
aspects of the student's performance and needs, and observing that the IEP was not required to
include those particular considerations).  Here too, "Plaintiffs cite no legal authority in support of

<ins>ii.  Timing of the September 2018 IEP</ins>

Finally, Plaintiffs argue that "the . . . IEP and placement were untimely and did not

provide a reasonable amount of time for [them] to consider the placement [at Rye Lake] prior to

the start of the school year," and thus, "[t]he District's timing . . . impeded [their] right to

meaningful participation in the process." (Pls.' Mem. 17.)  The two cursory sentences Plaintiffs

devote to this point suggest they are not entirely convinced of the argument themselves.  That is

understandable in light of the fact that Plaintiffs visited Rye Lake on August 22, 2018—two

weeks before the CSE issued the revised IEP—and therefore "had two weeks to consider their

misgivings about [the school]," as the SRO noted.  (SRO Op. 22.)  In any event, Plaintiffs raise

no allegations regarding any procedural defects in the scheduling of the CSE meetings, (*see*

*generally* Pls.' Mem.), and there is no evidence that they were prevented from participating fully

in CSE meetings or the discussion surrounding their child's placement for the 2018–19 school

year.  The Court therefore finds this final procedural argument unpersuasive.

<ins>2.  Substantive Adequacy</ins>

In reviewing for substantive errors, courts "examine whether the IEP was substantively

adequate, namely, whether it was reasonably calculated to enable the child to receive educational

benefits." *R.E.*, 694 F.3d at 190 (citation, alteration, and quotation marks omitted).  As noted,

"determinations regarding the substantive adequacy of an IEP should be afforded more weight

than determinations concerning whether the IEP was developed according to the proper

procedures," and "[d]eterminations grounded in thorough and logical reasoning should be

provided more deference than decisions that are not." *M.H.*, 685 F.3d at 244.

---

[their] argument that" the September 2018 IEP "should have . . . [more] explicitly stated" how
the recommended services would address the Student's unique needs, "and the Court has found
none." *Id.*

Plaintiffs challenge the substantive adequacy of the District's recommendations based on the June 2018 IEP and September 2018 IEP.  The Court will consider each of their arguments in turn.

### a.  Substantive Adequacy of the June 2018 IEP

Plaintiffs first argue that the June 2018 IEP was substantively inadequate because it was "almost identical" to the Student's IEP from the previous year.  (Pls.' Mem. 7; *see also id.* at 8 (arguing that the June 2018 IEP provided a "nearly identical setting" to that provided during the 2017–18 academic year).)   They point out that the District "was aware of the Student's social-emotional challenges throughout the previous 2017-2018 school year," including, for example, her difficulties with school avoidance.  (*Id.* at 8.)  By the time the June 2018 meeting occurred, the CSE also knew about the Student's self-harm ideation and increasingly aggressive behavior outside of school.  (*Id.*)  Plaintiffs reason that because the Student's 2017–18 program "failed to offer the [necessary] therapeutic support" and allowed the "Student's emotional health [to] regress[]," (*id.* at 7, 9 n.7), the "nearly identical" June 2018 IEP "deprived the Student of a FAPE," (*id.* at 9).

As an initial matter, similarities between IEPs "are not a basis for finding them to be inappropriate, particularly when, as here, District representatives, Plaintiffs, and [school personnel] all participated in extensive discussions at the [June 2018] CSE meeting leading up to the IEP recommendation."  *AR ex rel. MR v. Katonah Lewisboro Union Free Sch. Dist.*, No. 18-CV-9938, 2019 WL 6251196, at *13 (S.D.N.Y. Nov. 21, 2019); *see also P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 414 (S.D.N.Y. 2017) ("An IEP is not inappropriate, however, simply because it does not change significantly on an annual basis." (citation and quotation marks omitted)); *J.C.S. v. Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896, 2013 WL

3975942, at *12 (S.D.N.Y. Aug. 5, 2013) ("To the extent there is some similarity between goals from year to year, such continuity makes sense.  Modeling an IEP after the prior year's IEP, with appropriate changes, is a sensible practice that, as long as it is not done reflexively and without consideration of the student's individual circumstances and needs, does not signify that the student is likely to regress.").

But the main flaw in Plaintiffs' argument is that it simply parrots the IHO's conclusion without addressing—or even acknowledging—the SRO's specific critiques of this conclusion. As discussed, the IHO found that the "District's CSE was aware of the [S]tudent's school avoidance issues throughout the school year and her inability to access her educational program," as well as the fact that "the [S]tudent was expressing self-harm and was exhibiting aggressive behaviors outside of school."  (IHO Op. 20–21.)  In light of the District's knowledge regarding the Student's social and behavioral challenges, the IHO concluded that "the District had sufficient evidence that the [S]tudent required a therapeutic day program when [it] developed the IEP on June 14, 2018, and [that it] should have made such a recommendation at that time."  (*Id.* at 21–22.)  But in a more thorough and well-reasoned opinion, the SRO pinpointed two significant flaws in the IHO's analysis.  First, as noted, the evidence available at the June 2018 meeting indicated that the Student's aggressive behavior and mood dysregulation occurred *outside* the school setting.  (SRO Op. 18, 19.)  Similarly, the limited evidence regarding the Student's self-harm ideation did not link this ideation to the District high school.  (*Id.* at 19.) The SRO found, and the Court agrees, that "it was not until July 2018"—after Plaintiffs submitted Dr. Cohen's letter and a letter of their own—"that the trigger for the [S]tudent's behavior was specifically tied to the [D]istrict's building."  (*Id.*)  The SRO found that the IHO failed to "grapple" with this timing distinction and therefore lacked a sufficient basis to

"believe[], based upon the information available to the June 2018 CSE, that moving the [S]tudent from a therapeutic in-[D]istrict day program to a therapeutic out-of-[D]istrict program would further improve [the] [S]tudent's behaviors outside of school."  (*Id.*)  Second, the SRO found that the IHO failed to consider "how the CSE modified the [Student's] programming in the June 2018 IEP to add ESY [S]ervices in a small special class during the summer."  (*Id.*)  Having discussed the features of this modification, (*see id.* at 17), the SRO observed that the IHO did not explain why this modification was inadequate, (*id.* 18 ("The IHO did not provide an explanation of why, at the time of the June meeting, he believed removal of the [S]tudent from the [D]istrict . . . was required as opposed to . . . keeping the [S]tudent in [D]istrict and adding ESY [S]ervices . . . .")). The IHO's failure to consider this point is particularly troubling in light of the requirement that a student with disabilities be educated in the "least restrictive setting consistent with [her] needs," *M.H.*, 685 F.3d at 224 (citation omitted), which means that, "to the maximum extent appropriate," the student will be educated "with other students who do not have handicapping conditions," *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 108 (2d Cir. 2007); *see also P.C.*, 232 F. Supp. 3d at 408 ("[B]ecause the IDEA views private school as a last resort[,] a child may only be removed into a more restrictive environment when the nature and severity of her disability is such that education in regular classes with the use of supplementary aids and services cannot be satisfactorily achieved." (citation, alterations, and quotation marks omitted)); *M.B.*, 2017 WL 384352, at *7 ("Courts in this Circuit have uniformly held that the CSE is not required to consider non-public placements after it determines that a public placement is available that has the ability to implement the [IEP]."); *GB v. N.Y.C. Dep't of Educ.*, 145 F. Supp. 3d 230, 241 (S.D.N.Y. 2015) (observing that a private school "is the most restrictive placement").

In view of the deference accorded to an SRO's determinations, "it is incumbent upon the Parents to bring to the Court's attention any procedural or substantive flaws [in the SRO's decision] and explain why they allegedly warrant reversal." *T.Y. v. N.Y.C. Dep't of Educ.*, 213 F. Supp. 3d 446, 467–68 (E.D.N.Y. 2016) (quotation marks and alteration omitted) (quoting *M.H. v. N.Y.C. Dep't of Educ.*, No. 10-CV-1042, 2011 WL 609880, at *7 (S.D.N.Y. Feb. 16, 2011)). Here, however, Plaintiffs simply echo the IHO's conclusion without addressing or critiquing the SRO's rationale for reversing this conclusion. Based on its own independent review of the record, the Court sees no evident flaws in the SRO's reasoning. Indeed, the SRO's analysis shows careful, meticulous reasoning and a thorough grasp of the record. Accordingly, the Court will "defer to the reasoned conclusions of the SRO as the final state administrative determination." *M.H.*, 685 F.3d at 246. Based "on the weight of the evidence and the comparative thoroughness of the IHO's and the SRO's analyses," *T.Y.*, 213 F. Supp. 3d at 471, the Court finds that a preponderance of the evidence supports the conclusion that the June 2018 IEP was not substantively inadequate.

### b.  Substantive Adequacy of the September 2018 IEP

Plaintiffs also challenge the substantive adequacy of the September 2018 IEP. (*See* Pls.' Mem. 10–11.) They appear to make three specific arguments. First, they argue that the September 2018 IEP "failed to include specific strategies and supports necessary to allow the Student to make progress." (*Id.*) Second, they argue that Rye Lake "did not offer the broad spectrum of therapeutic support tailored to the Student's unique needs." (*Id.* at 11.) And third, they argue that Rye Lake "failed to provide evidence of an academic curriculum or peer grouping that was appropriate for the Student." (*Id.*)

i.  Strategies and Supports in the September 2018 IEP

Plaintiffs first argue that the programmatic supports listed in the September 2018 IEP "f[e]ll short of the necessary supports recommended by Dr. Janke and the Student's psychiatrist [because] they [were] not specifically tailored to the Student's ASD, disruptive mood disorder, heightened levels of anxiety surrounding school and peer interaction, and social pragmatic deficits." (*Id.* at 12.)[12]  The Court is unpersuaded by this argument for two reasons.  First, Plaintiffs continue to labor under the misconception that CSEs must defer to the opinions of privately retained psychiatrists and conform their recommendations accordingly.  But as the Court has already discussed, that is not the case.  Insofar as the strategies and programmatic supports recommended in the September 2018 IEP fell short of those suggested by Dr. Janke and Dr. Cohen, that alone does not provide a basis for finding the IEP substantively deficient.  *See, e.g.*, *E.S.*, 742 F. Supp. 2d at 436 (rejecting plaintiffs' argument that an IEP was substantively inadequate because it did not provide the student with the form of instruction recommended by a privately hired expert).

Second, Plaintiffs' argument is also unpersuasive in light of the SRO's rigorous, point-by-point discussion explaining how the strategies and supports listed in the IEP would address

---

[12] In Plaintiffs' brief, this argument is interwoven with the argument that the September 2018 IEP document itself "did not provide adequate information about how the supports at Rye Lake . . . would enable the Student to make meaningful progress in light of her unique circumstances." (Pls.' Mem. 12.)  As discussed *supra*, however, that is a separate argument that involves the procedural adequacy of the IEP document itself.  The Court understands Plaintiffs to also challenge the substantive adequacy of the programmatic supports that were included in that document, apart from any procedural deficiencies they perceived based on a lack of sufficient information in the document.

the Student's needs.  (*See* SRO Op. 24–26.)[13]  With respect to the Student's ASD diagnosis, for

example, the SRO observed that, according to the school psychologist,

> the [S]tudent's weaknesses . . . included[:] social pragmatic deficits, and her need
> for information to be presented visually[;] [her need] to be "prepped" for
> transitions, [and] have directions clarified and broken down[;] [her need to] use
> graphic organizers, [and] have tasks broken down[;] and [her need] to improve self-
> monitoring skills . . . .

(SRO Op. 25.)  "[A]ll" of these needs, the SRO concluded, "were incorporated into and

addressed by the September 2018 IEP."  (*Id.* (citing Sept. 2018 IEP 24, 27, 29–33).)  Moreover,

the September 2018 IEP indicated that Rye Lake had students with ASD diagnoses and that the

school had experience working with such students.  (*See* Sept. 2018 IEP 7.)  In the same vein, the

SRO cited hearing testimony regarding the Rye Lake staff's extensive experience working with

students on the autism spectrum.  (SRO Op. 25.)

        With respect to how Rye Lake would address the Student's social-emotional challenges

more generally, the September 2018 IEP contained a number of programmatic supports and

strategies that the SRO concluded were adequate to treat the Student's needs.  For example, the

SRO relied on hearing testimony regarding Rye Lake's "response team members" who were

trained in "therapeutic crisis intervention systems" and could "de-escalate students who were

emotionally agitated or becoming aggressive."  (*Id.* at 24; *see also* Sept. 2018 IEP 3 (indicating

that "[a]ll staff members are trained to be therapeutic"); *id.* at 4 (indicating that "[s]taff [were]

trained in TCI-Therapeutic Crisis Intervention").)  The SRO also cited hearing testimony

---

        [13] The strategies and supports provided by Rye Lake are listed on pages 3–4 of the
meeting information summary that accompanies the formal September 2018 IEP.  (*See* Sept.
2018 IEP 3–4.)  It is this list to which Plaintiffs apparently refer when arguing that "[t]hese
supports . . . fall short of the necessary supports recommended by Dr. Janke and the Student's
psychiatrist."  (*See* Pls.' Mem. 12 (citing the meeting information summary that accompanies the
IEP before raising the instant argument).)

regarding other features of the September 2018 IEP, such as (1) the support staff in Rye Lake's TSP-I program, which includes a psychologist, social worker, registered nurse, and school counselor; (2) the school's "positive behavioral interventions and supports" ("PBIS") five-point value system, which allocates "points" for positive behavior that students may use "to purchase desired items from the school store"; and (3) the school's "immense wrap-around therapeutic support," which includes DBT, CBT, and other methodologies that were recommended by the school psychologist.  (*See* SRO Op. 24–25; *see also* Sept. 2018 IEP 4 (noting availability of individualized counseling and a nurse who works with students individually); *id.* at 4, 6 (noting the PBIS program); *id.* at 3–5 (noting use of CBT and DBT).)

With respect to improving the Student's executive functioning skills, the SRO relied on testimony that Rye Lake had a "highly structured, highly therapeutic" environment that provided an individualized curriculum, a "high level of support" from teachers, and a "robust" PBIS that focused in part on developing coping and social skills—all "components of the September 2018 IEP."  (SRO Op. 26 (citing Sept. 2018 IEP 27–30).)  The SRO also pointed to other aspects of the Rye Lake program thought to address this particular area of the Student's needs, including the use of "Google Classroom," the availability of a board-certified behavior analyst to provide consultation on functional behavior assessments and behavior intervention plans, and a school nurse who could address the Student's "daily living skill needs."  (*Id.*; *see also* Sept. 2018 IEP 4, 6 (noting same features).)  To improve the Student's peer interaction skills, the SRO explained, the September 2018 IEP established annual goals for the Student to begin recognizing peers' thoughts or reactions based on nonverbal cues, and to "initiate peer interactions" in less structured situations.  (SRO Op. 26 (citing Sept. 2018 IEP 28–29).)  The SRO also noted that the IEP provided a weekly 40-minute session for individual counseling, as well as a 40-minute small

group counseling session.  (*Id.* (citing Sept. 2018 IEP 30).)  Finally, with respect to the Student's difficulties involving school avoidance, the meeting summary accompanying the September 2018 IEP described how the Rye Lake school psychologist had successfully worked with a similar student in the past, including by performing therapy sessions in the school parking lot and "[keeping] in close touch with [the] parents."  (*See* Sept. 2018 IEP 7; *see also* SRO Op. 26 (discussing this evidence).)

The SRO relied on all of this evidence in concluding that, "contrary to the IHO's conclusions," the strategies and supports outlined in the September 2018 IEP "addressed the [S]tudent's needs in great detail."  (SRO Op. 26.)  This determination, which involves "[t]he sufficiency of goals and strategies in an IEP[,] is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."  *L.O.*, 822 F.3d at 118 (first alteration in original) (citation omitted); *see also P.C.*, 232 F. Supp. 3d at 407 (noting that courts "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, *particularly with respect to determinations regarding the substantive adequacy of an IEP*" (emphasis added) (citations and quotation marks omitted)).   "[M]indful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy," *M.H.*, 685 F.3d at 240 (citation and quotation marks omitted), the Court will not disturb the SRO's determination, which was "grounded in thorough and logical reasoning," *id.* at 244, and a probing review of the record, *see R.E.*, 694 F.3d at 184 (observing that "[d]eference is particularly appropriate when the state officer's review 'has been thorough and careful'" (citation omitted)).

<u>ii.  Strategies and Supports at Rye Lake</u>

Plaintiffs' second challenge to the substantive adequacy of the September 2018 IEP is merely a variation on the first: Rye Lake, they argue, "did not offer the broad spectrum of therapeutic support tailored to the Student's unique needs."  (Pls.' Mem. 11.)  Of course, the strategies and supports prescribed in the September 2018 IEP—which the Court has found substantively adequate—were to be provided *at Rye Lake*.  And the SRO's conclusion regarding the substantive adequacy of the September 2018 IEP was based on evidence regarding Rye Lake's ability to provide the recommended strategies and supports.  (*See* SRO Op. 24–26.) Thus, having rejected Plaintiffs' first substantive argument, the Court must also reject the second.  In other words, because the strategies and supports to be provided by Rye Lake were substantively adequate to address the Student's needs, Rye Lake, by definition, did "offer the broad spectrum of therapeutic support tailored to the Student's unique needs."  (*See* Pls.' Mem. 11.)  The SRO made this point explicit when concluding "that Rye Lake was capable of implementing th[e] [September 2018] IEP with a highly trained staff having experience in, among other things, crisis intervention and numerous therapeutic approaches."  (SRO Op. 26.) Because the Court has found that the SRO's analysis regarding the substantive adequacy of the September 2018 IEP warrants deference, it will not disturb its finding that Rye Lake was capable of executing this educational program.  For the avoidance of doubt, however, the Court will go on to address Plaintiffs' specific points in support of their second substantive argument.

Plaintiffs use the bulk of their second argument to criticize the testimony of Rye Lake's principal, Scott Kaufman ("Kaufman"), who participated in the September 2018 meeting by phone, (*see* Sept. 2018 IEP 5–7), and later testified during the impartial hearing, (*see* IHO Tr. 508:9–583:15).  Though a detailed recitation of Plaintiffs' critiques is unnecessary, they focus on

Kaufman's difficulty recalling certain aspects of the Student's intake process, his "vague" testimony regarding his impressions of the Student and Rye Lake's rationale for accepting her, and his difficulty providing specific information about the Student's academic abilities and social-emotional needs.  (*See* Pls.' Mem. 12–14.)  They also argue that Kaufman did not provide sufficient information regarding whether Rye Lake "had experience addressing the needs of [s]tudents who had expressed self-harm ideation" and whether the school was adequately equipped to deal with such a student.  (*Id.* at 14.)  Based on these alleged deficiencies in Kaufman's testimony, Plaintiffs argue that the District "failed to provide a cogent and responsive rationale for placement at Rye Lake."  (*Id.* at 12.)  Without discussing or critiquing the testimony of other District witnesses, Plaintiffs state in conclusory fashion that "there was insufficient testimony to explain how [Rye Lake's] supports would be appropriate for the Student."  (*Id.*)

One problem with this argument is that, even if Kaufman could have been better prepared to address particular aspects of the Student's academic and social-behavioral profile and her admittance to Rye Lake, the SRO reasonably relied on his testimony regarding the strategies and supports offered at Rye Lake, on which Kaufman was obviously qualified to opine.  (*See* SRO Op. 24–26.)  Another problem with the argument is that Kaufman was far from the only witness called by the District in support of its case during the Impartial Hearing.  The District also called (1) Dr. Cunningham, a school psychologist for the District who worked with the Student from fifth through eighth grade, (IHO Tr. 44:6–9, 49:22–25; *see also id.* 41:20–234:3 (full testimony)); (2) Ms. Kathleen Canfield, a middle school special education teacher for the District who served as the Student's teacher in the TSP program during the 2017–18 school year, (*id.* at 276:6–8, 279:6–9; *see also id.* at 275:2–376:8 (full testimony)); (3) Ms. Jane McGowan, an occupational therapist and assistive technology coordinator for the District who worked with the

Student in seventh through eighth grades, providing twice monthly occupational therapy consultation services, (*id.* at 380:15–17, 383:4–12; *see also id.* at 377:23–407:24 (full testimony)); (4) Ms. Lindsay Esterow, a speech and language pathologist for the District, who evaluated the Student to assess her speech and language skills in the spring of 2018, (*id.* at 412:10–14, 413:23–414:6; *see also id.* at 412:2–428:5 (full testimony)); (5) Dr. Melissa Mittler, a school psychologist for the District, who attended the Student's re-evaluation and annual review meeting in June 2018, the CSE meeting in July 2018, and the CSE meeting in September 2018, (*see id.* at 430:20–22, 432:18–20, 434:10–435:4, 442:12–443:6; *see also id.* at 430:12–477:19 (full testimony)); and (6) Dr. Rukmini Bhalla, the District's Director of Special Education, who participated in meetings and consultations regarding the Student's educational program going back to 2016, which included meetings with the Student's parents, Dr. Janke, and the CSE, (*id.* at 585:20–23, 590:23–591:12; *see also id.* at 585:11–686:2 (full testimony)).  Even when Kaufman participated in the September 2018 meeting by phone, he did so alongside Rye Lake's school psychologist, Dr. Rachelle Krizter, who took an active part in that portion of the meeting.  (*See* Sept. 2018 IEP 5–7.)  In reaching his conclusion, the SRO relied not only on Kaufman's testimony, but also on the testimony of other District witnesses such as Dr. Cunningham and Dr. Mittler.  (*See* SRO Op. 24–26.)  Thus, there were other witnesses, in addition to Kaufman, who helped "to offer a cogent and responsive explanation for the[] [District's] decisions." *Endrew F.*, 137 S. Ct. at 1002.  In the Court's view, the perceived deficiencies in one witness's testimony do not compel Plaintiffs' overarching conclusion that the District failed to provide adequate justification for the Student's recommended placement at Rye Lake.  (*See* Pls.' Mem. 12.)

Plaintiffs also argue that the District did not adequately explain how Rye Lake would address the Student's self-harm ideation. (*Id.* at 14.)  Because this ideation was the key factor in the CSE's decision to place the Student outside the District, Plaintiffs maintain that "it was incumbent upon the District . . . to ensure [that] the Parents had adequate information relating to how the Student's expression of self-harm would have been addressed either in the IEP, during the September 5, 2018 IEP meeting, or at the [Rye Lake] intake." (*Id.*)  They contend that neither the September 2018 IEP nor the supporting testimony at the impartial hearing adequately addressed this point.  (*See id.*)

This, too, is a meritless argument.  As the SRO correctly noted, the Student's self-harm ideation and Plaintiffs' attendant concerns were "very strongly and specifically linked [to] [the Student's] impending attendance at the [D]istrict's high school and not 'any other high school.'" (SRO Op. 24 (quoting IHO Tr. 668–69).)  In response, Plaintiffs submit that the SRO "improperly narrowed the threat of self-harm as [being] solely contingent on placement in the District public high school." (Pls.' Mem. 15.)  They point out that the Student's self-harm ideations had been noted "as early as March 2018" in Dr. Parikh's report, and then argue that because "these ideations had previously existed," there was "no evidence to conclude that the Student's self-harm ideations were solely in response to the possibility of attending the District public high school." (*Id.*)  That is a specious argument.  Dr. Parikh's report indicated that the Student's "parents are concerned that [the Student] expresses that she visualizes wanting to kill herself." (Parikh Report 1.)  That is the sum and substance of Dr. Parikh's observation on the topic.  Then, after the June 2018 IEP was issued, Plaintiffs made clear that the Student's self-harm ideations were narrowly tied to a specific trigger, namely her fear of having to attend the District high school.  (*See* Dist. Ex. 19 ("T.M. Letter") 8 (indicating that the Student said "she

would just die if she ha[d] to go to Pleasantville [High School]); SRO Op. 20.)  It is therefore

bewildering why Plaintiffs assert there was "*no* evidence" linking the Student's self-harm

ideations "solely . . . to the possibility of attending the District public high school."  (Pls.' Mem.

15 (emphasis added).)  There was ample evidence doing precisely that.  Having decided not to

place the Student at the District high school—the sole, specific trigger for her self-harm

ideation—the CSE might reasonably have concluded that suicidal ideation was not an issue that

needed to be addressed in the Student's IEP.  As noted, however, the SRO still went on to

conclude that the "September 2018 IEP and the Rye Lake program were designed to address [the

Student's] social/emotional needs in this area."  (SRO Op. 24.)  Because this finding is well-

reasoned, supported by record evidence, and pertains to the substantive adequacy of the IEP, the

Court concludes that it warrants deference.  Plaintiffs' argument to the contrary is unpersuasive.

### iii.  Functional Grouping at Rye Lake

Finally, Plaintiffs argue "there was no evidence to establish that the Student would have

been suitably grouped with peers who had similar needs," as required under New York State

regulations.  (Pls.' Mem. 15.)  As noted, the SRO rejected this argument as "impermissibly

speculative," but also went on to conclude—based on testimony at the Impartial Hearing—that

"Rye Lake was capable of grouping the [S]tudent in compliance with the [S]tate's grouping

requirements."  (SRO Op. 28–29.)  Plaintiffs now challenge this conclusion.  (*See* Pls.' Mem. 16.

("The SRO improperly relied on the vague testimony of the District's witnesses regarding

functional grouping to find that the program would have resulted in appropriate grouping.").)[14]

---

[14] Although Plaintiffs appear to assume that functional grouping is required in order to
offer the Student a FAPE, it is not clear that is the case.  It is true that New York State
regulations aim to "ensure that students with disabilities are suitably grouped, requiring that such
students be placed with students who have similar levels of academic achievement, social and
physical development, and management needs."  *E.P. v. N.Y.C. Dep't of Educ.*, No. 15-CV-606,

In *R.E.*, the Second Circuit explained that, "[i]n determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision." 694 F.3d at 187. A court's "evaluation must focus on the written plan offered to the parents," and "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement." *Id.* at 195. Although parents may bring a prospective challenge to their child's recommended placement based on the school's actual (i.e., non-speculative) inability to implement the IEP before enrolling their child at the school, *see M.O.*, 793 F.3d at 244, "grouping evidence is not the kind of non-speculative retrospective evidence that is permissible under [Second Circuit precedent]," *G.S. v. N.Y.C. Dep't of Educ.*, No. 15-CV-5187, 2016 WL 5107039, at *15 (S.D.N.Y. Sept. 19, 2016) (quoting *J.C.*, 643 F. App'x at 33).

---

2016 WL 3443647, at *6 (S.D.N.Y. June 10, 2016) (citing NYCRR tit. 8 § 200.6(h)(2)). One regulation in particular requires that when a district implements a student's IEP, "[t]he social development of each student shall be considered prior to placement in any instructional group to assure that the social interaction with the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction provided." *Id.* (alteration in original) (quoting NYCRR tit. 8 § 200.6(a)(3)(ii)). But as the Honorable Ronnie Abrams noted in *E.P.*, the regulation adds that "[t]he social needs of a student shall not be the sole determinant of such a placement." *Id.* (citation omitted). Accordingly, courts have "understood that '[u]niformity of needs . . . is not required.'" *Id.* (alterations in original) (quoting *E.A.M. v. N.Y.C. Dep't of Educ.*, No. 11-CV-3730, 2012 WL 4571794, at *10 (S.D.N.Y. Sept. 29, 2012)). In *E.P.*, Judge Abrams observed that "[w]hile the [c]ourt [did] not go so far as to hold that an IEP need not ever specify functional grouping, [it] agree[d] with the SRO's conclusion that the IEP's failure to specify that [the student] be placed with peers of certain verbal ability did not render the IEP substantively deficient." *Id.*; *see also Q.W.H.*, 2016 WL 916422, at *10 & n.21 (upholding the substantive adequacy of an IEP that "did not mandate any particular functional grouping for [the student]"); *H.C. v. N.Y.C. Dep't of Educ.*, No. 14-CV-1927, 2015 WL 1782742, at *4–5 (S.D.N.Y. Apr. 10, 2015) (observing that school districts are "permitted to group students with different needs unless the grouping detracts from the opportunities of other students," and holding that, because the plaintiffs had not presented evidence to show that the student "would have regressed in the company of emotionally disturbed students," there was "no basis [to] conclud[e] that grouping [the student] with [such] students denied him a FAPE"). However, the Court need not resolve this issue to dispose of the instant Motion.

Accordingly, courts in this District have repeatedly rejected functional grouping claims like the ones Plaintiffs advance here. *See, e.g., E.E. v. N.Y.C. Dep't of Educ.*, No. 17-CV-2411, 2018 WL 4636984, at *12 (S.D.N.Y. Sept. 26, 2018) (rejecting parents' functional grouping argument because (1) the challenge was speculative—"there was no guarantee as to the composition of the class in which the [s]tudent would have been placed had he attended the proposed placement"— and (2) the district did not bear the burden of persuasion on that issue, which pertained to the placement site rather than the substantive adequacy of the IEP itself); *G.S.*, 2016 WL 5107039, at *15 (rejecting parents' argument "that the [school district's] placement would not have complied with state requirements regarding functional grouping" based on testimony regarding the IEPs of the students in the prospective class, and citing *J.C.* for the proposition that Second Circuit "precedent bars us from considering such retrospective evidence"); *L.C. v. N.Y.C. Dep't of Educ.*, No. 15-CV-4092, 2016 WL 4690411, at *4 (S.D.N.Y. Sept. 6, 2016) ("Any speculation about which students [the plaintiffs' child] would have been grouped with had he attended [the recommended placement] is just that—speculation.  And speculation is not a sufficient basis for a prospective challenge to a proposed school placement."); *K.F. v. N.Y.C. Dep't of Educ.*, No. 15-CV-1126, 2016 WL 3981370, at *12 (S.D.N.Y. Mar. 31, 2016) (allegations that student would not receive the appropriate functional grouping at the district's recommended placement "[spoke] only speculatively to [the school's] capacity to implement [the student's] IEP," and did not "establish that such a grouping would contravene [the student's] IEP"); *Q.W.H.*, 2016 WL 916422, at *10 (rejecting plaintiffs' grouping argument as "an impermissible prospective challenge"); *M.T. v. N.Y.C. Dep't of Educ.*, 165 F. Supp. 3d 106, 120 (S.D.N.Y. 2016) (allegations that a student's class might have what the parent considered an "inappropriate" peer grouping was "speculative and [could not] render a placement inadequate"); *N.K. v. N.Y.C. Dep't*

*of Educ.*, No. 15-CV-1468, 2016 WL 590234, at *7 (S.D.N.Y. Feb. 11, 2016) (rejecting grouping argument as speculative because "[w]hether or not the [s]tudent is grouped in a class that is inappropriate for his IEP cannot be known at the time of the parent's placement decision"). Because the Court finds that any grouping claim is impermissibly speculative, Plaintiffs' third substantive argument also fails.

* * * * *

In sum, the District's September 2018 IEP did not fail to offer the Student a FAPE for the 2018–19 school year.  Because the Student's IEP and recommended placement did not violate the IDEA, the Court need not reach the second and third prongs of the *Burlington/Carter* test. *See T.M.*, 752 F.3d at 152.

### III.  Conclusion

For the reasons stated above, Plaintiffs' Motion is denied.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 8), enter judgment for Defendant, and close this case.

SO ORDERED.

DATED:          September 24, 2021
                White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE